**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| CATHY MCCLEASE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 11cv0373 |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

YOHN, J.                                                    September 26, 2013

Plaintiff, Cathy McClease, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of the decision of the Commissioner of Social Security (the "Commissioner") denying her

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("the Act").  I referred the matter to a magistrate judge, who submitted a report recommending

that I affirm the Commissioner's decision to deny McClease SSI benefits.  McClease filed

objections to the report and recommendation, to which the Commissioner responded.  After

independent, *de novo* review of the report and recommendation, and plaintiff's objections, I will

approve and adopt the report of the magistrate judge denying plaintiff's request for review and

entering judgment in favor of defendant.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Procedural History

McClease protectively filed an application for SSI benefits on July 31, 2006, alleging

disability as of July 1, 2006, stemming from depression with psychosis, PTSD, endometriosis,

scoliosis, anxiety with panic attacks, and headaches.  (R. 82, 123, 127.)  The Social Security

Administration denied McClease's claims for SSI benefits on October, 27, 2006.  (R. 25, 82-86.)

McClease then timely filed a written request for a hearing which was held before an

Administrative Law Judge ("ALJ") on March 4, 2008.  (R. 34-69, 87.)  McClease, represented by

counsel, appeared and testified at this hearing, as did vocational expert, Daniel Rapochie.  (R. 36-

69).

Following this hearing, in a decision dated June 3, 2008, the ALJ denied McClease

benefits.  (R. 22-33.)  Specifically, the ALJ found that McClease had severe impairments with

regard to depression, anxiety, and a history of transient ischemic attacks,[1] and non-severe

impairments with regard to hypertension and endometriosis.  (R. 27, 28.)  McClease's

impairments, however, did not meet the criteria of "listed impairments" in appendix 1 of the

regulations provided for in the Act.   (R. 28.);  *See* 20 C.F.R. § 404, subpt. P, app. 1.  Ultimately,

the ALJ found that McClease has "the residual functional capacity to perform light work as

defined in 20 CFR 416.967(b) except the claimant is confined to routine, one to two step tasks;

the work should involve few work changes and be self paced in nature with no more than limited

contact with the public or co-workers and with limited supervision."  (R. 29.)

McClease, through counsel, then filed a timely request for review of the ALJ's decision

with the Appeals Council on July 18, 2008.  (R. 3, 19.)  The Appeals Council granted an

extension of time through January 8, 2010 for plaintiff to submit her brief in support of her

request for review.  (R. 12)  In the interim, on October 28, 2009, I remanded a separate claim, for

---

[1] A transient ischemic attack is defined as a brief period during which the brain does not
receive enough blood.  Its symptoms include blurred vision, slurred speech, loss of orientation
and numbness.  *Attorneys' Dictionary of Medicine* (Matthew Bender & Co., Inc., 2009).

disability insurance benefits and supplemental security income, McClease had previously filed on

October 7, 2004 ("2004 Claim").  By letter dated January 10, 2007, McClease, through counsel,

rather than filing her brief, requested that the 2004 Claim be consolidated with the instant claim.[2]

(R. 3-4.)  On May 27, 2010, the Appeals Council denied McClease's request for review on the

instant claim.  (R. 9-11.)  On that same date, the Appeals Council vacated the final decision in

the 2004 Claim and remanded the case to the ALJ.  (R. 7-8.)  On June 25, 2010, McClease

requested reconsideration of the Appeals Council's denial of her request for review, referencing

her January 7, 2010 letter and her request for consolidation.  (R. 3-4.)  On December 16, 2010,

the Appeals Council denied counsel's request.  (R. 1-2.)

 Thereafter, on January 25, 2011, McClease filed in this court a Request for Review of the

ALJ's decision.  I assigned the matter to a magistrate judge for a report and recommendation.  On

July 23, 2013, the magistrate judge concluded that the ALJ's decision was supported by

substantial evidence and recommended that the court affirm the Commissioner's decision to deny

benefits.  McClease filed timely objections to the magistrate judge's report and recommendation,

and the Commissioner filed a response to McClease's objections.  I will overrule the objections,

approve and adopt the recommendation of the magistrate judge, and enter judgment affirming the

Commissioner.

 **B. Factual History**

 McClease was born on August 31, 1959, and, at the time of the ALJ hearing in this

matter, she was 48-years-old.  (R. 41, 111.)   McClease cares for her twelve-year-old

---

 [2] A copy of counsel's correspondence is not in the record; however, the letter is
referenced in counsel's Memorandum of Law in Support of Claimant's Request for
Reconsideration of the Appeals Council's Denial of Claimant's Request for Review.

granddaughter – the daughter of McClease's daughter, Candace – whom she has raised since she was three-months-old.  (R. 48.)  Candace does not live with McClease.  (R. 48, 50.)  McClease also lives with a second grown daughter, and that daughter's child.  (R. 41.)  McClease completed her high school education.  (R. 132.)  She has worked, previously, as an assembly line worker, a packer, a telemarketer, a mailsorter, and a housekeeper  (R. 135, 157.)  Now no longer engaged in substantial gainful activity, McClease claims that she is disabled as a result of her anxiety, depression, uterine disorder, and a history of a transient ischemic attack.

Anxiety and Depression

McClease began receiving mental health treatment at the Family Service Association of Bucks County in March 2004.  (R. 244.)  She meets weekly with a therapist and monthly with her psychiatrist, Randi Mittleman, M.D.  (R. 242-243, 343-348.)  McClease's treatment records trace her struggle with depression and anxiety, stemming largely from her daughter, Candace's, chaotic and violent presence in her life.  (R. 284.)  Candace harasses McClease and has physically assaulted McClease, McClease's other daughter, her granddaughter, and a friend.  (R. 231, 269-270, 271, 277, 284, 370.)  McClease reports a constant fear of Candace coming into her home and starting "violent [and] destructive behavior."  (R. 282.)  In three separate treatment plan updates, spanning nearly a year from 12/26/06 through 9/12/07, McClease's therapist reiterates the same goal of lowering depression and increasing safety by "exploring and planning how to cope with grown children."  (R. 352-360.)   To that end, the therapist worked with McClease to develop safety plans, and discussed the need for a protection from abuse order against Candace.  (R. 263, 264, 271, 278, 279, 342.)

In her treatment records, Dr. Mittleman has variously noted that McClease was depressed,

4

anxious, "very upset about circumstances," and "overwhelmed by life circumstances" at their sessions.  (R. 337, 340, 341.)  On one occasion, Dr. Mittleman noted that McClease "[r]eports spending all day yesterday in bed depressed."  (R. 336.)  Dr Mittleman reports that McClease has difficulties with sleep and appetite, and had lost three pounds between November and December 2006, which was unintentional and attributable to her depression and anxiety.  (R. 285, 336, 339, 341.)  On December 21, 2006, in a psychiatric evaluation, Dr. Mittleman again reiterated McClease's various life stressors, including Candace's harassment, and noted that McClease admits to anhedonia, decreased energy and decreased concentration.  (R. 285.)  In addition to McClease's therapy sessions, Dr. Mittleman has prescribed medication for McClease, including Zoloft, Wellbutrin, and Zyprexa.  (R. 296.)

At her ALJ hearing, McClease reiterated the anxiety and stress she suffered because of her daughter, Candace.  (R. 47-50.)   She stated that her interactions with Candace leave hear "emotionally disturbed."  (R. 47-50.)  She testified that her anxiety and depression have led to concentration problems that prevent her from working.  (R. 46.)  She reported that she can "sit here for a while," to do "little things," but then her "depression sets in" and "[she] can't keep [her] focus."  (R. 47.)  She then takes her medication and lies down, due to the pain.  (R. 47.)  She further reports difficulties with sleep and appetite.  (R. 51, 52.)

McClease also testified to an active family life.  She has raised her grandchild, Candace's daughter, since the baby was three-months old.  (R. 48.)  She also watches her two-year-old granddaughter, overnight, while her other daughter is at work.  (R. 50-51.)  She visits with her parents at least once a week, and cared for them after her mother suffered a heart attack.  (R. 56-58.)  With regard to her activities outside of the family, McClease reports that she is "not a very

social" person, has few friends, and visits them rarely.  (R. 56.)  She attends church, and was

previously in the choir, but her attendance has diminished recently.  (R. 60.)

<u>Uterine Symptoms</u>

McClease also has a history of uterine problems.  From as early as 1996, Aaron Hasiuk,

M.D. has treated McClease for various conditions including cysts on her ovaries, heavy

menstrual bleeding, clotting and cramping.  (R. 186, 196.)  In May and August 2004, Dr. Hasiuk

performed two surgeries, attempting to alleviate McClease's symptoms.  (R. 190-191, 197-198.)

In October 2004, Dr. Hasiuk noted that it was "impossible to do the [surgeries] properly both

times" and that McClease continued to experience heavy bleeding and severe cramping.  (R.

202.)  At that time, Dr. Hasiuk prescribed Percocet for the pain and recommended that McClease

consider a hysterectomy at her three month check-up.  *Id.*

Thereafter, according to the record, McClease sought no further medical treatment until

March 20, 2007.  (R. 300.)  At that time, Dr. Hasiuk reported that McClease had heavy menstrual

bleeding, with clotting, and severe cramps.  *Id.*  Dr. Hasiuk scheduled McClease for a pelvic

ultrasound.  (R. 318.)  At McClease's follow-up appointment, Dr. Hasiuk noted that McClease's

pelvic ultrasound was "completely unremarkable," that her endometrial stripe was normal, and

that she was "not having any trouble with her periods."  (R. 298.)  Due to her back pain, and

"shadows in her kidneys," noticed during an ultrasound, Dr. Hasiuk recommended that McClease

see a urologist.  *Id.*

On July 5, 2007, Scott Hubosky, M.D., a urologist, examined McClease.  (R. 322-323.)

He noted her past medical history for endometriosis but made no observations of either bleeding

or cramping issues during menses.  *Id.*  He did, however, recommend a CT scan of the abdomen

6

and pelvis to check for kidney stones.  *Id.*  At the follow-up appointment on July 27, 2007, Dr.

Hubosky found "no evidence of stones or obstruction in the CT scan" and "no evidence of blood

on her urinalysis."  (R. 321.)  Dr. Hubosky did, however, note that McClease had back pain that

"seems to get worse at the time of her period."  *Id.*  According to the record, McClease sought no

further medical treatment for her uterine symptoms.

Prior to the ALJ hearing, the only other reference to these uterine symptoms consists of a

single statement, on March 12, 2007, when McClease complained of "female problems" to her

therapist.  At the ALJ hearing, McClease testified that she continues to have "a lot of cramping,

clotting, [and] heavy bleeding."  (R. 54.)  She stated that her period lasts for seven days, and that

"it's so painful [she] usually stay[s] in bed on those days."  *Id.*  McClease reported that she has

heavy bleeding and clotting for the first three days, and limits her activities for five days.  *Id.*

Transient Ischemic Attack

Finally, on May 2, 2007, while in North Carolina, McClease suffered from a severe

headache with accompanying neurological symptoms that included: right face, arm and leg

numbness and weakness, confusion, and slurred speech.[3]  (R. 37-38, 424.)  McClease received

immediate treatment at the Outer Banks Hospital of North Carolina, where she was prescribed

Plavix and referred to a neurologist.  (R. 424.)  On August 21, 2007, McClease was then

examined by a neurologist, Scott Mintzer, M.D., who reported that she was asymptomatic and

denied any further headache, weakness or neurological dysfunction.  *Id.*  At her ALJ hearing,

McClease reported continued weakness on her right side.  (R. 45-46.)  She also stated that, since

---

[3] In her testimony at the ALJ hearing, McClease stated that she experienced numbness on her left side.  (R. 45.)

7

the event, she attended church less, and was no longer a member of the church choir, because of her poor attendance.  (R. 60-61.)

## II.    STANDARD OF REVIEW

A district court reviews *de novo* the parts of the magistrate judge's report and recommendation to which either party objects.  28 U.S.C. § 636(b)(1). The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations.  *Id.*

With respect to the ALJ's decision, however, the standard of review is deferential. Although a district court exercises "plenary review" over any legal questions presented by the ALJ's decision, a court may review the ALJ's "factual findings only to determine whether the administrative record contains substantial evidence supporting the findings." *Allen v. Barnhart*, 417 F.3d 396, 398 (3d Cir. 2005).  As the Supreme Court has explained, "[s]ubstantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  This standard requires "more than a mere scintilla" of evidence but "somewhat less than a preponderance of the evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

The court may not "weigh the evidence," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), and may not "set the [ALJ's] decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently," *Hartranft*, 181 F.3d at 360; *see also* 42 U.S.C. § 405(g) ("The findings of the [ALJ] as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  In determining whether the ALJ's decision is

supported by substantial evidence, however, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with [the ALJ's] finding." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion."  *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

## III.    DISCUSSION

### A. Administrative Framework Overview

The issue before the ALJ was whether plaintiff was disabled within the meaning of the Social Security Act and thus entitled to SSI.  The Act defines a disability as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  A person has a disability when her impairment or combination of impairments render her unable to either return to previous work or, "considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy..."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled and eligible for SSI under the Act, the ALJ uses a five-step process.  20 C.F.R. § 416.920.  First, the ALJ considers the claimant's work activity and determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 416.920(b).  If she is, the ALJ will find that the claimant is not disabled and will deny

her applications for disability benefits. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step two, to determine whether she has a severe physical or mental impairment" that significantly limits her ability to perform basic work activities. 20 C.F.R. § 416.920(c). If the claimant's impairment is severe, the ALJ proceeds to the third step to determine whether the impairment meets or is medically equivalent to one of the "listed impairments" in appendix 1 of the regulations. 20 C.F.R. § 416.920(d). If the claimant's impairment is listed in the appendix or is medically equivalent to one of the listed impairments, the impairment is severe enough to prevent an individual from engaging in gainful activity, and the ALJ will find that the claimant is disabled. *Id.*

If the claimant's impairment does not meet or equal a listed impairment, the inquiry continues. The ALJ proceeds to step four, to determine whether the claimant has the residual functional capacity ("RFC") to perform her past work. 20 C.F.R. § 416.920(e). A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a). If the claimant can still perform her past work, the ALJ will find that she is not disabled and will deny her claims for benefits. 20 C.F.R. § 416.920(e). If the claimant cannot perform her past work, the ALJ proceeds to the fifth and final step and determines whether the claimant is able to do other work, given her RFC, as well as her age, education, and work experience. 20 C.F.R. § 416.920(f). If the claimant is able to do other work, the ALJ will find that she is not disabled. *Id.* To support a finding that a claimant is not disabled, however, the Commissioner must provide evidence that demonstrates that other work that the claimant can do exists in "significant numbers in the national economy." 20 C.F.R. § 416.960(c). In each of the first four steps, the claimant bears the burden of proof; but, the burden shifts to the Commissioner at step five.

10

*Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Applying this administrative framework to the plaintiff's impairments, the ALJ found: (1) plaintiff had not engaged in substantial gainful activity since July 31, 2006; (2) plaintiff's depression, anxiety and history of a transient ischemic attack are severe impairments, and her hypertension and endometriosis are non-severe impairments; (3) plaintiff's severe impairments do not meet or medically equal a listed impairment; (4) plaintiff has the RFC to perform light work and is capable of performing her past work as a housekeeper; and (5) plaintiff is capable of performing other jobs that exist in significant numbers in the national economy.

In her request for review, the plaintiff argued that the ALJ erred when she: (1) rejected the Medical Source Statement ("MSS") from plaintiff's treating psychiatrist, Dr. Mittleman, in the RFC assessment; (2) found plaintiff's uterine condition to be a non-severe impairment; and (3) failed to find plaintiff disabled, despite crediting her statements regarding her impairments. The magistrate judge recommended that the plaintiff's request for review be denied on each matter and judgment entered in favor of the Commissioner. The plaintiff filed timely objections, objecting only to the magistrate's report regarding: (1) the ALJ's rejection of Dr. Mittleman's MSS, and (2) the ALJ's failure to find plaintiff disabled, despite crediting her statements. The plaintiff did not object to the magistrate's finding that plaintiff's uterine condition was a non-severe impairment.

After careful review of the record, and the arguments raised by the plaintiff in her brief in support of her request for review, and in her objections to the magistrate judge's report and recommendation, I will not disturb the ALJ's findings and conclusions, or the report and recommendation of the magistrate judge.

**B. The ALJ Had Substantial Evidence to Support a Finding That Plaintiff Had the**

**Residual Functional Capacity to Perform her Past Work**

When assessing a claimant's RFC, the ALJ must consider all the relevant evidence in the

case record.  20 C.F.R. § 416.945.  This assessment embraces both medical evidence and other

non-medical evidence, including the claimant's descriptions of her own symptoms and

limitations, and observations made by both doctors and lay people.  *Id.*  An ALJ is obligated to

explain in her decision what weight she gives to "all of the pertinent evidence before [her]."

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).  An ALJ "may not

reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529

F.3d 198, 204 (3d Cir. 2008).  "Although the ALJ may weigh the credibility of the evidence,

[she] must give some indication of the evidence which [she] rejects and [her] reason(s) for

discounting such evidence." *Id.* "In the absence of such an indication, the reviewing court cannot

tell if significant probative evidence was not credited or simply ignored." *Id.* (quoting *Cotter v.

Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

### 1.        Medical Opinions in RFC Determinations

Plaintiff's primary contention is that the ALJ did not give the proper weight to her long-

time treating psychiatrist, Dr. Mittleman.  Specifically, plaintiff argues that the ALJ erred in

failing to credit Dr. Mittleman's MSS opinion.  For the following reasons, I find that the ALJ did

not err in failing to credit Dr. Mittleman's report.

Medical evidence includes "statements from physicians and psychologists or other

acceptable medical sources that reflect judgments about the nature and severity of [claimant's]

impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite

impairment(s), and [her] physical or mental restrictions."  20 C.F.R. § 416.927(a).  If any of the medical evidence is inconsistent with other evidence, or is internally inconsistent, the ALJ will weigh the evidence in making its disability determination.  20 C.F.R. § 416.927(c)(2).  The opinion of an examining physician is ordinarily weighted more than that of a non-examiner, and the opinion of a treating physician is especially prized. 20 C.F.R. §§ 404.1527(d)(1), (d)(2). When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given "controlling weight." 20 C.F.R. § 416.927(d)(2).  However, when a medical opinion is inconsistent with substantial evidence in the case record, it is given no such controlling weight. Id.

Further, the determination of a claimant's RFC is an administrative finding. § 416.927(e). Such a finding directs the "determination or decision of disability," and is therefore dispositive of the case.  *Id.*  Accordingly, unlike the medical opinions from a treating physician regarding the nature and severity of claimant's impairment, opinions from medical sources that speak to a claimant's RFC are afforded no special weight.  *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, (3d Cir. 2007) ("An ALJ need not defer to a treating physician's opinion about the ultimate issue of disability because the determination is an administrative finding reserved to the Commissioner.") While the ALJ will look to an opinion from a claimant's treating physician for RFC determinations, that opinion is accorded no more weight than observations made by non-treating physicians or non-medical personnel such as family, neighbors and friends.  20 C.F.R. §§ 416.945(a), 416.927(e)(2).

13

In the MSS, Dr. Mittleman reported that the plaintiff suffered from an Axis I major depressive disorder, and has been "persistently depressed" for "at least 2 years." (R. 394-395.) According to Dr. Mittleman, the plaintiff suffers from sleep, appetite, and mood disturbances, decreased energy, anhedonia and blunt affect. (R. 394.) Dr. Mittleman rated the plaintiff as having fair (seriously limited, but not precluded), poor or no ability to remember work-like procedures, maintain attention for two hours, maintain attendance and be punctual, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruption, or deal with normal work stress. (R. 397.) She further rated the plaintiff as having marked (moderate, but less than extreme) "deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner." (R. 398.) She also indicated the plaintiff would experience three episodes of "deterioration or decompensation in work or work-like settings" which would cause the plaintiff to "withdraw from that situation." (R. 398.) Finally, she recorded, "[p]atient reports memory problems, concentration problems. Depression causes fatigue which would prevent completion of a workday" (R. 397.) According to Dr. Mittleman, the plaintiff's "anxiety level and depression causes [her] concentration problems." (R. 396-397.)

The ALJ points to substantial evidence to support her rejection of Dr. Mittleman's opinion. First, the ALJ declined to accept Dr. Mittleman's MSS because it was inconsistent with the therapy notes in the case record, including Dr. Mittleman's own therapy notes. (R. 31.) The ALJ pointed generally to exhibit D14F and D15F, which indicated that despite suffering from depression, including a bout that left her unable to get out of bed for a day, the plaintiff was able to raise her pre-teen granddaughter, assist her daughter with her own newborn daughter, and feed

14

her ill father.  (R. 31, 335, 336, 337, 342.)  As the ALJ indicated, Dr. Mittleman's therapy notes

"generally report relatively benign symptoms and rather unrestricted activities of daily living."

(R. 31.)

Second, the ALJ pointed to the plaintiff's three global assessment of functioning scores

("GAF")[4] as objective medical evidence inconsistent with Dr. Mittleman's MSS.  (R. 31.)  In

January 2007, Dr. Mittleman assessed the plaintiff at a 55 GAF; in August 2007, a 61 GAF; and

in September 2007, a 56 GAF.  (R. 288, 352, 355.)  A range of 51 through 60 indicates moderate

symptoms (e.g. flat affect), or moderate difficulty in social or occupational functioning.  A range

of 61 through 70 indicates some mild symptoms (e.g. depressed, mild insomnia), or some

difficulty in social and occupational functioning.  Again, these scores are inconsistent with the

extensive concentration, attendance and decompensation problems, and ultimately the inability to

work, as reflected in Dr. Mittleman's MSS.

Third, the ALJ noted that Dr. Mittleman's findings regarding the plaintiff's inability to

maintain consistent attendance at work, or "perform mental work activities on a sustained basis"

was less persuasive, because it was based on the plaintiff's subjective complaints, rather than

objective medical findings.  (R. 31.)  As the ALJ noted, Dr. Mittleman indicated in the MSS that

the "patient reports" memory and concentration problems consistent with the plaintiff's inability

to complete a work day.  (R. 397.) .

Finally, the ALJ points to the Mental Residual Functional Capacity Assessment

---

[4] The GAF score is used to rate an individual's overall level of "psychological, social, and occupational functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Text Revision 2000)*.  The GAF scale ranges from 1 to 100 and is divided into ten ranges of functioning.  *Id.*

(MRFCA) by the state psychologist, John Hower, Ph. D.  (R. 31.)  Dr. Hower found that,

contrary to Dr. Mittleman's MSS, the plaintiff was only moderately limited in her ability to

understand and remember instructions, carry out those instructions, maintain regular attendance

and punctuality, and the ability to complete a normal workday and work week.  (R. 258-259.)

Dr. Hower concluded that the plaintiff "can function in production oriented jobs requiring little

independent decision making," and "retains the ability to perform repetitive work activities

without constant supervision."  (R. 260.)

 In her objections, the plaintiff argues that the ALJ did not weigh probative evidence when

she decided not to accept Dr. Mittleman's findings in the MSS.  The plaintiff first points to the

magistrate judge's acknowledgment of "repeated references to the emotional toll her daughter's

unpredictable violence against Plaintiff has caused."  (Pl. Obj. 4.)  It is difficult to discern from

that brief statement what exactly plaintiff objects to with regard to these findings.  In her brief in

support of her request for review, the plaintiff argued that the ALJ's decision mischaracterized

the treatment the plaintiff received at the Family Service Association, claiming that the ALJ's

findings were "not an accurate reflection of Dr. Mittleman's records."  (Pl. Br. 9.)  Plaintiff

points to extensive therapy notes documenting the trouble with her violent daughter, Candace.

*Id.*  Plaintiff notes that her fear of Candace "is not unfounded"and has caused her both physical

and emotional distress.  *Id.*  She further points to the series of protection from abuse orders she

has secured, and the safety plan that she developed with her therapist to try and resolve the fear

and anxiety that Candace creates in her life.  (Pl. Br. 10.)

 The plaintiff's recitation of the record does not demonstrate how, exactly, the ALJ

mischaracterized plaintiff's treatment.  The ALJ acknowledged Candace's impact, noting that the

16

plaintiff "copes with very stressful life circumstances, which, understandably, affect her mental health." (R. 30.)  The ALJ also specifically acknowledged that Candace's violation of a protection from abuse order had resulted in her incarceration.  *Id.*  While the decision does not meticulously cite to every violent or stressful event affecting the plaintiff, it does recognize the "significant family stressors," and attributes at least part of the plaintiff's health problems to the family situation.  *Id.*

The plaintiff next argues that the ALJ's decision and the magistrate judge's report and recommendation overlooked various treatment notes, including notes showing that the plaintiff suffered from anhedonia, decreased energy, decreased concentration, and that her depression and anxiety affected her appetite and sleep.  (Pl. Obj. 5.)  Plaintiff further notes that the record indicated that the plaintiff appeared "emotionally tired" on one visit, and that she "seem[ed] to struggle with depression which gets in the way of managing everyday life & household." (Pl. Obj. 6.)   The plaintiff gives many citations to the record, documenting her various struggles with depression.  (Pl. Obj. 5-6.)

Except for the single notation to plaintiff's decreased concentration, however, none of the references to the medical records refute the inconsistency the ALJ found between Dr. Mittleman's MSS opinion and the record.  The ALJ found that Dr. Mittleman's medical records are inconsistent with her findings in the MSS regarding the plaintiff's inability to concentrate, remember work-like procedures, maintain attention for two hours, maintain attendance and punctuality, sustain an ordinary routine without special supervision, follow simple tasks or complete a normal workday or work week without interruption.  While it is true that the ALJ neglected to cite the record with the same degree of specificity helpfully found in plaintiff's brief,

the exclusions plaintiff notes are not really pertinent to the ALJ's consideration regarding how she would weigh Dr. Mittleman's MSS report.  Therapist and psychiatrist notes that generically reference various and inconsistent problems with poor appetite, problems sleeping, medication adjustments, anhedonia and an inability to get out of bed one day help to track the general symptoms associated with the plaintiff's struggle with depression.  Such citations, however, do not contradict the inconsistencies that the ALJ noted between Dr. Mittleman's therapy notes and her MSS report.  Accordingly, while the references are pertinent to a determination of plaintiff's impairments, they are not pertinent to the ALJ's determination that Dr. Mittleman's conclusions, regarding the plaintiff's inability to work, are not persuasive.

The plaintiff next argued that the ALJ relied excessively on her home life, and daily activities caring for her parents, children, and grandchildren.  However, as indicated above, plaintiff's home life was only one of a number of considerations the ALJ gave in assessing and rejecting Dr. Mittleman's MSS.  In addition to the plaintiff's active home life, the ALJ referenced the plaintiff's three GAF scores which placed her comfortably in the moderate to mild range for difficulty in occupational functioning.  The ALJ also pointed to the state psychologist's assessment, which found that the plaintiff's medical records did not indicate an inability to continue previous work.  And, most convincingly, the ALJ pointed to the fact that nothing in Dr. Mittleman's notes, prior to her MSS report, indicated the sort of difficulty in daily functioning that would result in an adverse RFC determination.

Plaintiff further claims that the ALJ's reliance on her active home life is misguided, because, "Dr. Mittleman's records and report emphasize the distinction between the ability to function in a home setting and a work setting."  (Pl. Obj. 7.)  However, the plaintiff cites to

nothing in Dr. Mittleman's records that reflects this distinction, and the court could find no such

reference on its review of the case record.  Instead, the plaintiff cites Dr. Mittleman's MSS,

where she checked off "Yes" to the question, "Does your patient have a residual disease process

that has resulted in such marginal adjustment that even a minimal increase in mental demands or

changes in the environment would be predicted to cause the individual to decompensate?"  (Pl.

Obj. 7; R. 399.)  Nothing in this question indicates a distinction between the plaintiff's ability to

function at home as opposed to work.  And nothing in Dr. Mittleman's checkmark indicates any

consideration of such a distinction.  In fact, Dr. Mittleman's treatment notes indicate that,

contrary to her answer to the question, the plaintiff, in fact, did deal with "minimal increase in

mental demands [and] changes in her environment."  (R. 399.)  Dr. Mittleman reported that the

plaintiff had to care for her mother and father, when her mother became ill, and the plaintiff's

daughter had a baby while living with the plaintiff.  (R. 335, 336, 337.)  Dr. Mittleman's notes do

not indicate that these changes caused the plaintiff to decompensate.  And, certainly, Dr.

Mittleman never addressed in these notes any distinction between the plaintiff's ability to cope

with mental demands and environmental changes in her home life and her ability to do the same

in her work life.  The plaintiff next refers to her GAF scores as the only other evidence

demonstrating this supposed distinction Dr. Mittleman makes regarding the plaintiff's ability to

function at home as opposed to work.  (Pl. Obj. 7-8.)  But, again, Dr. Mittleman herself makes no

such finding on any records submitted to the court.  The inferences plaintiff draws from the MSS,

creating a distinction between plaintiff's ability to cope with an active home life, but not an

active work life, was never made by Dr. Mittleman in either her treatment notes or her MSS

opinion.

Finally, the plaintiff objects to the ALJ's finding that Dr. Mittleman's MSS opinion regarding the plaintiff's inability to concentrate was less persuasive because it was based on the plaintiff's subjective complaints.  (R. 31.)  In the MSS, Dr Mittleman noted that "the patient reports memory problems, concentration problems."  (R. 397.)  The plaintiff argues that Dr. Mittleman's opinion regarding the plaintiff's concentration problems was based on the doctor's "clinical observations, the [p]laintiff's mental status examination and psychiatric evaluation, as well as her review of prior records."  (Pl. Obj. 8.)  However, the plaintiff points only to findings Dr. Mittleman makes in the MSS.  Plaintiff, in fact, concludes that "there is ample evidence that Dr. Mittleman's opinion had 'reasonable support' in the record," without citing to a single note in Dr. Mittleman's medical records to support this conclusion.  In its own examination of the medical records, the court did find a single reference to plaintiff's decreased concentration, but it was also based on the plaintiff's own complaint.  (R. 285.)  The court found no further reference in Dr. Mittleman's treatment records that indicate the plaintiff suffered from the severe concentration problems outlined in Dr. Mittleman's MSS report.[5]  Further, none of the plaintiff's treatment plans ever mentioned memory or concentration problems, and her therapists never created treatment goals to address any memory or concentration problems.  (R. 290-292, 349-360.)

The ALJ pointed to substantial evidence to support her finding that Dr. Mittleman's MSS opinion was not persuasive.  The inconsistency between Dr. Mittleman's MSS and her treatment records; the plaintiff's GAF scores; the state psychologist's report; and Dr. Mittleman's reliance

---

[5] While the court has read all the case record, many of Dr. Mittleman's hand-written notes are illegible.

on the plaintiff's subjective complaints, raise enough evidence such that "a reasonable mind

might accept [it] as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360.  Given the

extremely deferential substantial evidence standard that binds the court, I agree with the

conclusion of the magistrate judge.

### 2.      Plaintiff's Symptoms in the RFC Determination

Plaintiff next objects to the ALJ's credibility finding regarding the plaintiff's testimony.

Specifically, the plaintiff objects to the ALJ's determination that plaintiff was not disabled,

despite acknowledging that the plaintiff's statement at the ALJ hearing were "generally entirely

credible."  For the following reasons, I find that the ALJ did not err when she credited the

plaintiff's statements, but failed to find that the plaintiff's symptoms resulted in a disability.

When a claimant's alleged disability is based, in part, on the claimant's subjective

symptoms, the ALJ must employ a two-step analysis to determine the severity of those

symptoms.  20 C.F.R. § 416.929.  In the first step, the ALJ must determine whether the claimant

has a "medically determinable impairment that could reasonably be expected to produce" the

claimant's symptoms.  20 C.F.R. § 416.929(b).  The claimant must present objective "medical

signs and findings, established by medically acceptable clinical or laboratory diagnostic

techniques," showing the existence of the impairment.  *Id.*   In the second step, the ALJ must

analyze the "intensity and persistence" of the claimant's symptoms to determine how her

symptoms "limit [her] capacity for work."  20 C.F.R. § 416.929(c).   Thereafter, the ALJ will

consider "the extent to which there are any conflicts between [claimant's] statement and the

evidence in the case record, and will make a determination on claimant's symptoms to the extent

they are consistent with the evidence.  20 C.F.R. § 416.929(c).  A claimant's statements about

21

her symptoms, alone, are insufficient to establish a disability, "there must be medical signs and laboratory findings which show that [a claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(a).

In her decision, the ALJ found that McClease had "medically determinable impairments that could reasonably be expected to produce the alleged symptoms." (R. 30.) She further found that McClease's statements were "generally entirely credible." *Id.* Nonetheless, the ALJ found that McClease had "failed to demonstrate disability within the meaning of the Act." *Id.* In support, the ALJ notes that the plaintiff's "activities of daily living are such as would not be consistent with wholly work preclusive limitations." (R. 30.) These activities include babysitting her daughters' children, caring for her mother, keeping medical appointments, and attending church functions. (R. 30-31.) Thus, while the plaintiff "copes with very stressful life circumstances, which, understandably, affect her mental health," her daily life activities support a finding that her RFC permit her to resume her previous work. (R. 31.)

The ALJ also cited plaintiff's GAF scores which indicate only mild or moderate symptoms, consistent with the ability to do unskilled work. (R. 30.) The ALJ further found that the plaintiff's "mental health treatment has been routine and conservative in nature." *Id.* The record gives no evidence of plaintiff needing or receiving emergency treatment, inpatient psychiatric treatment, or intensive outpatient treatment. (R. 30-31.) Finally, the state agency psychologist found that the plaintiff "had the capacity to meet the basic mental demands of work on a competitive basis, and perform simple, routine, repetitive tasks." (R. 31.)

In both her brief in support of plaintiff's request for review and her objections to the magistrate's report, the plaintiff focuses on the ALJ's acceptance of plaintiff's statements as

"generally entirely credible."  However, the plaintiff forwards different arguments in each discussion regarding this issue.  Unfortunately, both of plaintiff's arguments are unavailing.

Plaintiff first argues in her brief that, once the ALJ accepted plaintiff's statements as "generally entirely credible," she should have found plaintiff disabled "based upon the testimony of the vocational expert."  (Pl. Br. 17.)  At the hearing, the ALJ asked the vocational expert, if he were to credit the plaintiff's testimony that day, whether the plaintiff would be able resume her past work.  (R. 68.)  The vocational expert answered in the negative, citing the plaintiff's statement regarding her heavy menstruation.  (R. 68-69.)  Given this exchange, the plaintiff argues that finding her testimony "generally entirely credible," must result in a finding of disability.  (Pl. Br. 17.)  This argument is easily dismissed, because it ignores the fact that it is the ALJ, and not the vocational expert, who makes the ultimate decision regarding disability.  A vocational expert's opinion on disability does not bind the ALJ.

Thereafter, plaintiff argues in her objections to the magistrate's report and recommendation that the ALJ's finding that plaintiff's testimony was "generally entirely credible," allows the ALJ to, essentially, sidestep the weighing of necessary factors when determining plaintiff's credibility.  (Pl. Obj. 9-10.)  As the plaintiff notes, the magistrate judge acknowledged that the statement was "confusing" and determined that the ALJ found some of the plaintiff's statements credible, while others were not.  (Pl. Obj. 9.)  Given that, the plaintiff argues that the ALJ did not do the necessary weighing of plaintiff's credibility before denying disability.  However, the plaintiff fails to offer any support from the record for this argument.

Contrary to the plaintiff's claim, the ALJ did assess the plaintiff's credibility in her RFC determination.  The ALJ considered "claimant's statements regarding symptoms and their effects

on function, her medical history, the character of her symptoms, her activities of daily living, the type of treatment she received, other measures she has taken to relieve symptoms, and her response to treatment" (R. 30.)  As noted above, the ALJ weighed the plaintiff's daily activities, GAF scores, the routine and conservative nature of her mental health treatment, the patient's lack of intensive outpatient or inpatient care, and the state agency psychologist's findings, when making her RFC and disability determination.  The ALJ's findings are sufficient to establish substantial evidence in support of her determination that the plaintiff possessed the necessary RFC to return to previous work.

Plaintiff's arguments that the ALJ erred in her treatment of Dr. Mittleman's MSS opinion, and the plaintiff's own testimony are unavailing. The ALJ has offered substantial evidence to support her RFC and disability finding, with an analysis that is internally consistent and consistent with the case record.

### III.   Conclusion

For the reasons set forth above, I will overrule plaintiff's objections to the report and recommendation, and affirm the decision of the Commissioner to deny McClease supplemental security income.  An appropriate order follows.